## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SIMON AND SIMON, PC d/b/a CITY SMILES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALIGN TECHNOLOGY, INC.,<br><br>Defendant. | CIVIL ACTION NO.<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION COMPLAINT |

## CLASS ACTION COMPLAINT

1.     Plaintiff Simon and Simon, PC d/b/a City Smiles ("Plaintiff"), a dental practice, brings this action against Align Technology, Inc. ("Align" or "Defendant") on behalf of itself and a proposed class of similarly-situated dental and orthodontic practices (collectively, "Dental Practices"), who purchased one or both of the following product types directly from Align during the Class Period (defined below): (1) custom-manufactured, transparent, removable dental aligners made from clear plastic (Defendant's product is called "Invisalign;" the category of product generally: "Aligners"), and/or (2) hand-held digital intraoral scanners used to generate scans to order Aligners (Defendant's product is called "iTero;" the category of product generally: "Scanners").

2.     In summary, as alleged herein, defendant Align has leveraged its dominant position in the Aligner market to suppress competition in the Scanner market and has leveraged its dominant position in the Scanner market to suppress competition in the Aligner market. This

conduct has allowed Align to artificially increase and/or maintain its market share and market power in both markets, and thereby artificially inflate its prices in both markets. In essence, Defendant has engaged in a scheme to create a de facto bundle of its Aligners and Scanners, but without providing any corresponding "discount" to purchasers, for the purpose of maintaining and increasing its monopoly power in both the Aligner and Scanner markets. Plaintiff seeks treble damages and injunctive relief, demanding a trial by jury of all issues so triable, under Section 2 of the Sherman Act (15 U.S.C. § 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

3.     Plaintiff alleges the following based upon personal knowledge as to matters relating to itself and upon information and belief and based on the investigation of counsel as to all other matters:

## NATURE OF THE ACTION

4.     Defendant Align's primary source of revenue comes from its Invisalign brand Aligners, by far the dominant product in the Aligner market. Align earns well over a billion dollars per year selling Invisalign products at gross margins typically exceeding 75%.

5.     While Align also sells iTero—the dominant Scanner for use with Aligners—the primary focus of Align is selling more Aligners at extremely high profit margins. As Align's Chief Executive Officer, Joe Hogan, stated in a July 2017 investor call, "[W]e're in the clear aligner business and anything that help us to sell more clear aligners directly . . . would be in our . . . range. So, that's why we have a scanner business. We have a scanner business not from a diversification standpoint. We have a scanner business because it allows us to sell more clear aligners."

2

6.      Align knew that the use of digital Scanners, like iTero, would make it more likely that a Dental Practice would use Aligners, both because the "digital workflow" makes Scanners the easier and more accurate complement to Aligners, and because once a Dental Practice purchases a digital Scanner, that practice would be more likely to order more Aligners as a way to pay for the Scanner. The bottom line was that more iTero Scanners meant more Invisalign orders. As Joe Hogan told investors in an April 2018 call, "So yeah, [iTero] is another component of growth in the company overall. What's great is it's synergistic growth, right. You have equipment growth, but it really leads to the growth of our core product line which is Invisalign." And as Mr. Hogan reminded Wall Street analysts when discussing Scanner sales in an October 2018 investor call: "[R]emember, it's just a wonderful footprint for us for future Invisalign business once we have those scanners in place."

7.      For years before the relevant period for the challenged conduct in this case, Align had been able to charge high prices and earn high profit margins on Invisalign because the product was protected by a thicket of hundreds of patents that Align wielded aggressively to protect its Aligner monopoly. As Joe Hogan stated in 2017:

> We've been in business now for almost 20 years, and we've had so few competitors and people think it's because we have this great IP, it's true we have good intellectual property, but it took 15 years for people to really believe that you can move teeth with plastics[.] …It gave us this period of time to really iterate and learn without the outside influence of other competitors coming in.[1]

8.      Align's monopoly started to come under threat in 2017 due to the expiration of many of its key patents. Having enjoyed many years operating without "the outside influence of other competitors coming in," and having raised investors' expectations of continued high revenues and profit margins, Align could not risk responding to Aligner competition by lowering

---

[1] Michela Tindera, *Out of Silicon Valley, A Billion-Dollar Orthodontics Business Built with Plastic and Patents*, Forbes (April 25, 2017).

prices or spending money to improve quality. Instead, Align responded with the anticompetitive scheme alleged herein, which was, in short, to leverage its monopoly power in the Aligner market to increase or maintain its monopoly power in the Scanner market, and to leverage its monopoly power in the Scanner market to increase or maintain its monopoly power in the Aligner market.

9.      In particular, when a patient seeks Invisalign treatment, that patient would visit a Dental Practice that is authorized by Defendant to prescribe the treatment. A dentist or staff member would then normally perform a scan of the patient's mouth using a Scanner, and the dentist would review the scan. If the dentist determines that Invisalign treatment is appropriate, the Dental Practice will then purchase a set of Invisalign Aligners directly from Defendant, custom-designed and custom-manufactured for that specific patient based on the patient's mouth scan.

10.      Simon and Simon, PC d/b/a City Smiles ("Plaintiff") is a Dental Practice that purchased Defendant's Invisalign Aligners and Defendant's iTero Scanner directly from Defendant during the Class Period (defined below). Plaintiff seeks to represent a Class (defined below) of the tens of thousands of Dental Practices in the United States that purchased Invisalign Aligners and/or iTero Scanners directly from Defendant during the Class Period.

11.      Defendant Align is a dominant producer of both Aligners and Scanners. As of September 2018, Align has an over 80% share in the market for Aligners in the United States and an over 80% share in the market for Scanners in the United States. As explained below, Align has leveraged its dominant position in the Aligner market to suppress competition in the Scanner market, and has leveraged its dominant position in the Scanner market to suppress competition in the Aligner market. This conduct has allowed Align to artificially increase and/or maintain its

market share and market power in both markets, and thereby artificially inflate its prices in both markets. In essence, Defendant has engaged in a scheme to create a de facto bundle of its Aligners and Scanners, but without providing any corresponding "discount" to purchasers, for the purpose of maintaining and increasing its monopoly power in both the Aligner and Scanner markets.

12.     Defendant has held hundreds of patents on its Aligner technology. These patents, along with other high barriers to entry, had deterred entrants into the Aligner market. Certain key patents began to expire in 2017, and with those patents expiring, several additional companies either entered the market for Aligners or considered entering the market. Instead of reacting to the advent of competition by improving its product or lowering its prices, Defendant worked to suppress that potential competition by using its dominance in the Aligner market to impair competition in the Scanner market, and then in turn using its dominance in the Scanner market to impair competition in the Aligner market.

13.     Align's anticompetitive scheme involved the use of de facto "closed system" Scanner technology, which makes it impracticable to use the iTero scanner to order Aligners from other Aligner manufacturers. In particular, iTero does not accept scans in the industry standard file format, and thus, a Dental Practice wishing to order non-Invisalign using iTero scans must either undertake an expensive and time-consuming process of converting iTero scans to a format that can be used for other Aligners, or use silicone-based molds to create a cast of a patient's mouth and teeth, which is a messy, uncomfortable, time-consuming, and inefficient method. (By contrast, the Trios Scanner worked with any Aligner manufacturer's technology.) In addition, Align has intentionally formatted its technology so that it does not accept scans from any Scanner, but rather, only allows Invisalign orders from a limited group of authorized

Scanners. Until the termination of the Interoperability Agreement with 3Shape, discussed below, the Trios Scanner was one such authorized Scanner. The upshot of this closed system is that iTero and Invisalign operate as a bundle by making iTero the only viable option for Dental Practices seeking to sell the market-dominant Invisalign to their patients, and by preventing other Scanners from becoming established in the market that would allow dentists to order competing Aligners without undue burden. As a result of this scheme, Defendant was able to maintain its monopoly power in both the Aligner and Scanner markets, exclude actual and potential competitors, and charge Plaintiff and the proposed Class supracompetitive prices for Aligners and Scanners.

14.    Competing Scanner manufacturer 3Shape has been selling a Scanner called the Trios since 2011, and in the United States since 2012. Unlike Align's iTero, the Trios is able to send scans to any manufacturer of Aligners without any fees, delays, conversion process, or loss of image resolution. (Although since the revocation of the Interoperability Agreement, discussed below, Trios is no longer able to be used to order Invisalign-brand Aligners.) And while Align and 3Shape had initially agreed to allow the Trios to produce scans for Defendant's Invisalign Aligners, beginning about February 2016, Defendant sought to change the terms of its relationship with 3Shape by proposing an agreement whereby 3Shape would agree to make its Trios send scans exclusively to Align for Invisalign Aligners. The purpose of this proposed arrangement was for Defendant to impair competing Aligner manufacturers.

15.    3Shape refused to make the Trios exclusive to Defendant, as Defendant had asked, instead seeking to continue to allow the Trios to send scans to any Aligner manufacturer in the interests of open competition. Upon being rebuffed, Defendant then asked 3Shape to enter into a joint venture that would allow Defendant to control Trios. 3Shape again refused.

16.     Upon 3Shape's refusal to agree to make its Scanner exclusively order Defendant's Aligners, beginning in or about January 2018, Defendant punitively stopped allowing the 3Shape Trios Scanner to send scans to Defendant for orders of Invisalign Aligners. Those Dental Practices with Trios Scanners were forced either to quit offering Invisalign to patients (and many of those patients were in the middle of multi-month treatment programs with Invisalign), to order a new Scanner (despite having spent thousands of dollars on a Trios, which many Dental Practices find to be a superior Scanner), or to go back to using silicone-based molds. In short, Align was willing to forego short-term profits on its Aligners (from Trios owners ordering Invisalign) in order to engage in the anticompetitive bundling scheme described herein and thereby further its dominance in the Aligner and Scanner markets.

17.     Defendant's anticompetitive scheme has enabled Defendant to maintain and/or enhance its monopoly power in the markets for Scanners and Aligners because: (1) 3Shape's Trios Scanner and other potential competitors in the market for Scanners have been impaired in their ability to compete with Defendant's iTero Scanner given that dentists are much less likely to purchase a Scanner that is unable to order the market-leading Invisalign Aligner (subjecting patients to a silicone mold is a burdensome and inefficient substitute), and (2) other manufacturers of Aligners are impaired in their ability to compete with Defendant's Invisalign because the dominant iTero scanner only sends its results to Defendant on commercially reasonable terms (*i.e.*, ordering any other Aligner requires a burdensome and unacceptable process).

18.     Defendant's anticompetitive scheme has reduced competition in the Aligner and Scanner markets, and thereby artificially inflated the price of both Aligners and Scanners.

Plaintiff and members of the proposed Class have been injured by paying these artificially inflated prices.

## JURISDICTION AND VENUE

19.     Plaintiff brings claims under Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District.

21.     This Court has personal jurisdiction over the Defendant, as it is incorporated in this District, markets and distributes Aligners and Scanners in this District, enters into contracts within this District, and otherwise transacts business within this District.

## INTERSTATE COMMERCE

22.     The market for Aligners in the United States is a national market.

23.     Defendant has marketed its Invisalign Aligners to Dental Practices and patients in all 50 states.

24.     Defendant has sold its Invisalign Aligners to Dental Practices in all 50 states.

25.     Defendant has recruited and trained dental and orthodontic professionals to perform scans for Invisalign patients in all 50 states, and there are dental and orthodontic professionals who actively perform scans for Invisalign patients in all 50 states.

26.     The market for Scanners in the United States is a national market.

27.     Defendant has marketed and sold its iTero Scanner to Dental Practices in all 50 states.

28.     Defendant's business in Aligners and Scanners involves a continuous and uninterrupted flow of commerce across state lines.

29.     Defendant's anticompetitive actions have had a substantial effect on interstate trade and commerce in the markets for Aligners and Scanners.

## PARTIES

30.     Plaintiff Simon and Simon, PC d/b/a City Smiles, is a Dental Practice located in Chicago, IL that performs scans for Invisalign using the iTero Scanner. Plaintiff purchased Invisalign Aligners from Defendant during the Class Period at prices that were artificially inflated as a result of Defendant's anticompetitive scheme, and thereby suffered antitrust injury. Plaintiff also purchased the iTero Scanner from Defendant during the Class Period at a price that was artificially inflated as result of Defendant's anticompetitive scheme, and thereby suffered antitrust injury.

31.     Defendant Align Technology, Inc. is a Delaware corporation. Defendant has several Invisalign providers in the District of Delaware, which are trained by Defendant to prescribe Invisalign, which purchased iTero Scanners from Defendant, and which purchase Invisalign from Defendant for their patients.

32.     Non-party 3Shape Trios A/S is a Danish corporation. Its American subsidiary 3Shape Inc. is a Delaware corporation.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action on behalf of itself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23 as representative of a Class defined as follows:

> All persons or entities in the United States that purchased Invisalign Aligners and/or iTero Scanners directly from Defendant Align Technology, Inc. during the period beginning March 15, 2015 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). Excluded from the Class are (a) Defendant, its subsidiaries, affiliate entities, and employees, and (b) all federal or state government entities or agencies.

34.     The members of the Class are so numerous that joinder is impracticable. Tens of thousands of Dental Practices have purchased Invisalign Aligners and iTero Scanners directly from Defendant during the Class Period.

35.     There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, *inter alia*:

a.      Whether Defendant terminated its agreement with 3Shape in order to maintain and/or enhance its monopoly power in the market for Aligners;

b.      Whether Defendant terminated its agreement with 3Shape in order to maintain and/or enhance its monopoly power in the market for Scanners;

c.      Whether Defendant's practice of allowing only its iTero Scanner to send scans directly to Defendant for Invisalign patients on commercially reasonable terms, and preventing 3Shape's Trios Scanner and other potentially competing Scanners from doing so, constitutes a violation of the antitrust laws;

d.      Whether Defendant's policy of requiring dentists who wish to prescribe Invisalign Aligners, but who do not use Defendant's iTero Scanner or another approved scanner, to create manual casts of patients' teeth from a silicone mold, involves imposing a burdensome and inefficient alternative;

10

e.       Whether Defendant's refusal to accept industry standard files to order Invisalign has legitimate medical or technical reasons or is anticompetitive;

f.       Whether Defendant has substantial market power in the market for Aligners sold in the United States;

g.       Whether Defendant has substantial market power in the market for Scanners sold in the United States;

h.       Whether Defendant has substantially foreclosed competition in the markets for Aligners and/or Scanners;

i.       Whether Defendant leveraged its monopoly power in the market for Aligners to suppress competition and gain monopoly power in the market for Scanners;

j.       Whether Defendant leveraged its monopoly power in the market for Scanners to suppress competition and gain monopoly power in the market for Aligners;

k.       Whether Defendant's scheme has artificially raised prices and reduced competition in the market for Aligners;

l.       Whether Defendant's scheme has artificially raised prices and reduced competition in the market for Scanners;

m.       Whether Defendant's scheme has a legitimate pro-competitive justification;

n.       Whether the conduct alleged herein artificially maintained, preserved, or enhanced Defendant's market power in the market for Aligners;

o.       Whether the conduct alleged herein artificially maintained, preserved, or enhanced Defendant's market power in the market for Scanners;

p.       The operative time period and extent of Defendant's antitrust violations;

q.      Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for Aligners, and the proper measure of such overcharge damages;

r.      Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for Scanners, and the proper measure of such overcharge damages; and

s.      The appropriate injunctive and equitable relief for the Class.

36.     Plaintiff's interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that it can fairly and adequately represent and protect their interests.

37.     Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions, including substantial experience litigating such cases within this District.

38.     Class treatment of Plaintiff's federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

39.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## STATEMENT OF FACTS

40.     Defendant sells the Invisalign Aligner, a set of dentist-prescribed, removable, transparent plastic dental aligners that is custom-made for each patient to correct that patient's tooth misalignment.

41.     Defendant's Invisalign is the dominant product in the Aligner market, with a market share of over 80% as of September 2018.

42.     Defendant earns approximately a 78% gross margin on Invisalign, and approximately a 60% gross margin on iTero.

43.      Defendant markets Invisalign to Dental Practices, who receive training from Defendant and then are able to prescribe Invisalign to patients.

44.     Defendant also markets Invisalign to members of the general public, who have to go to an authorized dental professional or orthodontic professional to be prescribed and to order Invisalign.

45.     After a patient visits a Dental Practice and is reviewed for Invisalign, the Dental Practice prescribes Invisalign, and the patient agrees to order Invisalign, the Dental Practice purchases the patient's custom-made Invisalign Aligners directly from the Defendant.

46.     According to Defendant's website, as of the third quarter of 2018, there are 146,682 dental and orthodontic professionals trained to prescribe Invisalign, and 74,091 of those are currently active prescribers of Invisalign. On information and belief, approximately half of each of those dental and orthodontic professionals are located in the United States.

47.     According to Defendant's website, as of the third quarter of 2018, 6.1 million patients have received Invisalign. On information and belief, approximately half of those patients are located in the United States.

48.     3Shape began selling its Trios Scanner in Europe in 2011 and in the United States in 2012.

49.     Defendant began selling its iTero Element Scanner in 2015.

13

50.     Defendant has accepted scans for Aligners from its own iTero Scanner, 3Shape's Trios Scanner, 3M's True Definition scanner, and Dentsply Sirona's CEREC Omnicam scanner. Defendant's iTero and 3Shape's Trios are designed to provide scans appropriate for prescribing Aligners. They are able to scan a patient's entire mouth, including jaws and both sets of teeth. 3M's True Definition and Dentsply Sirona's CEREC Omnicam are designed to scan individual teeth for crowns and other localized dental restorative work. They are not suitable for performing a full-mouth scan for the customized design of a patient's Aligners, and they are thus not reasonably interchangeable economic substitutes for iTero and Trios Scanners.

51.     After the dentist or dental staff member uses a scanner to scan the patient's mouth, the dentist digitally sends the scan to an Aligner manufacturer to have sets of Aligners custom-made for that patient.

52.     Defendant's iTero Scanner is a de facto "closed system" Scanner. It is designed to send its digital scans directly to Defendant to order Invisalign. As a result of Defendant's alleged scheme, for a Dental Practice with an iTero scanner to order an Aligner from another manufacturer, the Dental Practice must pay fees to Defendant and undergo a file-conversion process, which takes longer and results in lower resolution scans. Defendant intentionally imposes these burdensome and commercially and medically unacceptable terms to ensure that dental professionals with an iTero Scanner will only order Invisalign regardless of the cost or quality of other Aligners in the market.

53.     3Shape's Trios Scanner is an "open system" Scanner that is able to send scans to any manufacturer of Aligners that accepts STL files, a computer-aided design (CAD) file that is the standard in the industry for the custom design of a patient's Aligners, allowing a dental

professional to select any available Aligner based on a dentist's assessment of its cost and quality.

54.     3Shape's Trios Scanner has several other advantages over Defendant's iTero Scanner. The Trios has greater image resolution, and it is more portable, allowing practices with more than one office to purchase only one Scanner, and the Trios' standard model is wireless (whereas most iTero models are not).

55.     In December 2015, Defendant and 3Shape entered into an agreement under which 3Shape's Trios Scanner could send its digital scans directly to Defendant for patients to order the Invisalign Aligner (an agreement called an "Interoperability Agreement"). The agreement took effect in October 2016.

56.     Between October 2016 and January 2018, there were over 40,000 Invisalign orders made through Trios Scanners in the United States.

57.     Defendant also had or has Interoperability Agreements with 3M for its True Definition scanner, and Dentsply Sirona for its CEREC Omnicam scanner, but those scanners are designed to scan individual teeth for crowns and other localized dental restorative work, and they are not suitable for performing a full-mouth scan for the customized design of a patient's Aligners.  They take far longer to perform a scan than either the Trios or iTero Scanners, and produce lower quality scans that require additional work before they can be used to order Aligners.

58.     During the period from October 2016 through January 2018, the Interoperability Agreement between 3Shape and Defendant meant that Dental Practices had two viable options for Scanners suitable for ordering Aligners: the Trios and the iTero. Since the Trios could send its scan to any Aligner manufacturer without any fee or conversion process, and without any

delay or reduction in image resolution, Dental Practices with a Trios could easily order Aligners from any manufacturer under acceptable terms.

59.     In early 2015, as part of the anticompetitive scheme alleged herein, Defendant told 3Shape that in order to enter into the Interoperability Agreement, 3Shape would have to agree to make the Trios Scanner exclusively order Invisalign and not any other Aligners. 3Shape refused in the interests of favoring free and open competition in the market for Aligners. The Interoperability Agreement between Defendant and 3Shape explicitly gave 3Shape the right to send scans to other Aligner manufacturers.

60.     In February 2016, Defendant told 3Shape that if it wanted further collaboration between the companies, it would have to make Defendant its "preferred partner" for Aligners. On information and belief, this meant an exclusive agreement for the Trios to provide scans only for Defendant's Invisalign, and not for Aligners from other manufacturers. Defendant's President and CEO Joseph Hogan, and its Chief Marketing, Portfolio, and Business Development Officer Raphael Pascaud represented Defendant at that meeting. 3Shape again refused in the interests of favoring free and open competition.

61.     In November 2016, after the Interoperability Agreement had already taken effect, Pascaud asked 3Shape again to make the Trios exclusive to Defendant and Invisalign. In order to achieve this objective, Pascaud proposed that Defendant and 3Shape enter into a joint venture to produce the Trios, which would effectively give Defendant control of the Trios, while Defendant would still retain sole control of Invisalign. 3Shape again refused in the interests of favoring free and open competition.

62.     At various times in 2017, Pascaud continued to demand that 3Shape enter into the proposed joint venture, and 3Shape continued to refuse.

63.     Defendant's major patents protecting Invisalign began to expire in October 2017. The expiration of those patents should have opened the Aligner market to competitive entrants. Faced with the market entry of additional competitors, Defendant did not seek to preserve its market share by reducing the cost and/or improving the quality of its products, but instead engaged in the anticompetitive actions described herein.

64.     On December 20, 2017, Defendant announced that it was going to terminate the Interoperability Agreement with 3Shape as of January 17, 2018, and the Trios would no longer be able to submit scans to Defendant for Invisalign.

65.     After many dental professionals and the American Association of Orthodontists expressed dismay at the termination, Defendant extended the date of termination until January 31, 2018, and then terminated the Interoperability Agreement on that date, making Trios Scanners no longer usable to order Invisalign.

66.     Defendant continues to accept scans from the Trios in Europe, which is further evidence that its refusal to do so in the United States is motivated by anticompetitive reasons and not legitimate medical or technical concerns.

67.     As of September 2018, Defendant had over an 80% share of the market for Aligners and Scanners. There are also high barriers to entry in each such product market.

68.     Defendant's scheme has enhanced Defendant's monopoly power in the Scanner market because dental professionals are much less likely to order a Trios Scanner that cannot readily or practicably be used to order the market-dominant Invisalign Aligner. 3M and Dentsply Sirona's scanners are not suitable for ordering Aligners, and silicone molds are burdensome and inefficient and not an acceptable substitute for a proper Scanner. Also, Defendant's refusal to accept STL files under commercially reasonable terms to order Invisalign also reduces

competition in the Scanner market, because potential manufacturers of competing Scanners won't commit the money, personnel, and resources into developing and marketing a new Scanner when demand for it would be greatly reduced because it cannot be used to order the market-leading Aligner. As a result, the iTero Scanner has become the only viable choice for dental professionals who prescribe the market-dominant Invisalign Aligners.

69.     Defendant's scheme has also enhanced Defendant's monopoly power in the market for Aligners. Under Defendant's scheme, it designs its market-dominant Scanner to order Aligners only from Defendant under normal and acceptable terms. As a result, Invisalign has become the only viable choice for dental professionals who prescribe Aligners.

70.     Because of this conduct, Defendant has recently secured deals with the two largest dental support organizations ("DSO") in the United States: Heartland Dental and Aspen Dental.[2] 3Shape submitted a bid for the Aspen Dental contract, and the Trios received the highest score in testing, but Aspen Dental told 3Shape that it would not select a Scanner that could not seamlessly order the market dominant Invisalign Aligner. 3Shape also bid for the Heartland Dental contract but was not selected because it did not have a current interoperability agreement with Invisalign. Align knows that these DSO agreements are critical to the maintenance of its monopoly power.

71.     As a result of the scheme alleged herein, Defendant's sales of the iTero grew 84% in the first quarter of 2018 and rose by another 50% from the first quarter of 2018 to the third

---

[2] A DSO contracts with many dentists to perform non-clinical functions for them, which can include accounting, billing, equipment leasing, HR (human resources), IT (information technology), marketing, and procurement of supplies. This allows sole practitioners and small group practices to focus on treating their patients instead of performing those non-clinical functions, and also to benefit from economies of scale.

quarter. In 2017, Defendant had over an 80% market share in the market for Scanners in the United States.

72.     Defendant sued SmileDirectClub, a relatively small Aligner manufacturer that began operations in 2014. SmileDirectClub settled under terms requiring it to give 17% of its shares to Defendant, having Defendant manufacture its Aligners, and only using Defendant's iTero Scanner in its retail locations. This conduct effectively neutralized SmileDirectClub as a potential competitor to Defendant.

73.     Many major dental corporations have entered or are considering entering the Aligner market and would have the resources and know-how to compete effectively with Invisalign if not for Defendant's anticompetitive scheme. Danaher manufactures Aligners, Dentsply Sirona and Straumann have purchased Aligner manufacturers, and Henry Schein has considered entering the Aligner market.

74.     Many smaller Aligner manufacturers would also compete effectively with Invisalign if not for Defendant's anticompetitive scheme, including SmileDirectClub, Candid Co., YourSmileDirect, Uniform Teeth, and Orthly.

75.     Illegal leveraging under antitrust laws involves use of monopoly power in one market (the 'upstream' market) to gain or threaten monopoly power in another, related market (the 'downstream' market).

76.     Defendant possessed monopoly power in both the Aligner market, with over an 80% market share, and in the Scanner market, with over an 80% market share. Defendants have managed to protect their substantial market power and market share by creating substantial barriers to entry for potential competitors in both product markets.

77.     Defendant engaged in illegal abuse of market power, including through monopoly leveraging, under the antitrust laws when it used its monopoly power in the Aligner market to suppress competition in, and gain monopoly power in, the Scanner market, and when it used its monopoly power in the Scanner market to suppress competition in, and gain monopoly power in, the Aligner market. Defendant has designed its Scanner and Aligner systems and products in such a way that it effectively forces Dental Practices to purchase iTero Scanners if they want to sell Invisalign Aligners under commercially reasonable terms. And once the iTero Scanner is purchased and installed in Dental Practices, Invisalign becomes the only practicable Aligner solution. In this way, Defendant has bundled both of its dominant products together, foreclosing greater than 80% of competition in the markets for Aligners and Scanners, and ensuring Defendant's ability to charge supracompetitive prices.

78.     Defendant profited from the interoperability agreement with 3Shape that allowed Trios users to order Invisalign, and in fact received 40,000 orders from Trios users during the duration of the agreement. Defendant sacrificed profits in the short-run by not allowing the Trios or other potential Scanners to order Invisalign, but it did so in order to make the iTero the only viable Scanner for dental professionals to purchase and use, which would allow it to enhance monopoly power in the Scanner market in the long-run.

79.     Defendant sought to use its market power to eliminate competition from the Trios and other competing Scanners that are able to order Aligners from other manufacturers, and thereby make the iTero the only viable option for dental professionals to purchase and use. Not only would that allow Defendant to enhance its monopoly power in the Scanner market, but that would also allow Defendant to prevent other Aligner manufacturers from becoming established

and competing with Invisalign, allowing Defendant to enhance its monopoly power in the Aligner market.

80.     Defendant's actions in (1) its refusal to accept scans from other comparable Scanners to order Invisalign under commercially reasonable terms, (2) its refusal to accept STL files to order Invisalign under commercially reasonable terms, and (3) its imposing burdensome and inefficient terms on dental professionals who want to order Invisalign without using the iTero are not carried out for the medical benefit of Invisalign patients or to make Invisalign more attractive to dental professionals and patients, but have the anticompetitive purposes of furthering Defendant's monopoly power in the Scanner market by eliminating demand for rival Scanners.

81.     Defendant's actions in programming the iTero so that it is only able to easily order Aligners from Defendant, and so that it can only order from other Aligner manufacturers under unreasonable terms and through a process involving fees, delays, a conversion process, and a loss of image resolution, are not carried out for the medical benefit of patients, but have the anticompetitive purposes of furthering Defendant's monopoly power in the Aligner market by eliminating demand for rival Aligners.

82.     Defendant intended to harm, and indeed its anticompetitive actions have harmed competition in the Aligner market, resulting in higher prices, reduced competition, and reduced product choice. This is the type of injury that the antitrust laws were intended to prevent and is a direct and proximate result of Defendant's anticompetitive scheme, and therefore Defendant has caused antitrust injury to the Class.

83.     Defendant intended to harm, and indeed its anticompetitive actions have harmed competition in the Scanner market, resulting in higher prices, reduced competition, and reduced

product choice. This is the type of injury that the antitrust laws were intended to prevent and is a direct and proximate result of Defendant's anticompetitive actions, and therefore Defendant has caused antitrust injury to the Class.

## RELEVANT MARKET – ALIGNERS

84.    At all relevant times, Defendant had substantial market power in the market for Aligners. It had the power to maintain the price of Invisalign at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as Invisalign.

85.    To the extent Plaintiff's claims require the definition of a relevant market for Aligners, the relevant product market is the market for custom-manufactured, transparent, removable dental aligners made from clear plastic or similar materials.

86.    To the extent Plaintiff's claims require the definition of a relevant market for Aligners, the relevant geographic market is the United States. The Food and Drug Administration has to approve medical devices such as Aligners, and consumers in the United States cannot practically seek out alternative Aligners from other countries that have not been approved for sale and use in the United States. Therefore, the price of Aligners in other countries does not affect the market for Aligners in the United States.

87.    As of September 2018, Defendant had over an 80% share of the market for Aligners in the United States.  Moreover, there are substantial barriers to entry for potential competitors in the Aligner market.

88.    Metal braces are not a reasonable substitute for Aligners. Aligners are used for patients with moderate tooth misalignment, or who cannot receive metal braces due to activities in which they are involved, such as certain sports. Metal braces are used for patients with severe

tooth misalignment, for whom Aligners would not be sufficient for proper treatment.   Metal braces are also far more uncomfortable, typically take a longer period for treatment to complete, require patients to avoid certain foods, and require repeated visits to an orthodontist.

89.     A significant and non-transitory artificial inflation of the price of Aligners would not cause any significant number of consumers to purchase other potentially substitutable products, including metal braces, instead, so as to make such price inflation unprofitable. A significant and non-transitory artificial inflation of the price of metal braces would not cause any significant number of consumers to purchase Aligners instead, so as to make the artificial price inflation unprofitable.

## RELEVANT MARKET – SCANNERS

90.     At all relevant times, Defendant had market power in the market for Scanners. It had the power to maintain the price of iTero Scanners at supra-competitive levels profitably without losing substantial sales to other products used for the same purposes as iTero Scanners.

91.     To the extent Plaintiff's claims require the definition of a relevant market for Scanners, the relevant product market is the market for hand-held digital intra-oral scanners used to generate scans to order Aligners.

92.     To the extent Plaintiff's claims require the definition of a relevant market for Scanners, the relevant geographic market is the United States. The Food and Drug Administration has to approve medical devices such as Scanners, and dental professionals in the United States cannot practically seek out alternative Scanners from other countries that have not been approved for sale and use in the United States. Therefore, the price of Scanners in other countries does not affect the market for Scanners in the United States.

93.     In 2017, Defendant had over an 80% share in the market for Scanners in the United States.  Additionally, there are substantial barriers to entry for potential competitors in the Scanner market.

94.     3Shape's Trios and Defendant's iTero are part of the relevant market for Scanners.

95.     3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners are designed to scan individual teeth for crowns and other localized dental restorative work, and they are not as suitable for performing a full-mouth scan for the customized design of a patient's Aligners, and they are thus not reasonable economic substitutes for Scanners.

96.     Accordingly, 3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners are not part of the relevant market for Scanners.

97.     Silicone molds are not adequate or reasonable substitutes for Scanners. They are unpleasant for patients, and they provide lower accuracy than Scanners.

98.     A small but significant and non-transitory artificial inflation in the price of Scanners would not cause any significant number of consumers to purchase other potentially substitutable products, including 3M's True Definition and Dentsply Sirona's CEREC Omnicam scanners, instead, so as to make the artificial price inflation unprofitable.

**SUBSTANTIAL FORECLOSURE**

99.     By effectively forcing Dental Practices to purchase iTero Scanners if they want to sell Invisalign Aligners, Defendant has bundled both of its dominant products together, foreclosing greater than 80% of competition in the markets for Aligners and Scanners.

100.     As described above, Invisalign was the first—and for a long time only—Aligner sold in the United States. Invisalign has a greater than 80% market share in the Aligner market.

Many Dental Practices feel a need to carry Invisalign because of its market dominance and due to patient requests, and many Dental Practices have a substantial installed base of users such that even if the Dental Practice wished to sell other Aligners (and was willing to forego all future customers who wished to use Invisalign), such a Dental Practice would still have to deal with Align because of the numbers of patients who started on, and need to finish on, Invisalign.

101.    By Defendant allowing only its own Scanners to order Invisalign under commercially reasonable terms, which effectively makes Defendant's iTero Scanner the only viable Scanner option for Dental Practices who want to sell the market-dominant Aligner to their patients, Defendant has foreclosed competition in at least 80% of the market for Scanners.

102.    Additionally, Align has at least an 80% share of the Scanner market. By Defendant making its iTero Scanner only able to order Invisalign under acceptable terms, which effectively makes Invisalign the only viable Aligner option for Dental Practices who own an iTero Scanner to prescribe and sell to their patients, Defendant has foreclosed competition in at least 80% of the Aligner market.

103.    While the typical anticompetitive bundling case involves the use of discounts across a bundle of products to induce the purchaser to buy the whole bundle and forego a competitor's product, Defendant here has not provided a discount for purchasers of both Aligners and Scanners. Instead, it created a de facto bundle by making it impracticable for Dental Practices to sell Invisalign without an iTero Scanner, or for Dental Practices with an iTero Scanner to sell other Aligners. Through this scheme, Align has substantially foreclosed competition in both the Aligner and Scanner markets.

## COUNT ONE
### Monopolization of the Aligner Market (15 U.S.C. §2)

104.    Plaintiff repeats and reiterates each of the allegations contained in paragraphs above as if fully set forth herein.

105.    The relevant product market is the Aligner market, and the relevant geographic market is the United States.

106.    As a result of the scheme alleged herein, Defendant possesses monopoly power in the Aligner market, with a market share over 80% as of September 2018.

107.    Defendant leveraged its monopoly power in the Scanner market to further maintain and enhance its monopoly power in the Aligner market by, *inter alia*, terminating its Interoperability Agreement with 3Shape when 3Shape refused to cause Trios to work effectively with Defendant's Aligners exclusively, and programming the iTero so that it is only able to easily order Aligners from Defendant, and so that it can only order from other Aligner manufacturers under unreasonable terms and through a process involving fees, delays, a conversion process, and a loss of image resolution.

108.    Defendant's actions were carried out willfully and with the specific intent to maintain its monopoly power in the Aligner market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

109.    The direct, foreseeable, and proximate result of Defendant's anticompetitive conduct was to increase prices and harm competition in the Aligner market.

110.    There is no legitimate pro-competitive justification for Defendant's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

111.     As a direct, material, and proximate result of Defendant's violation of § 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

112.     Plaintiff and the Class seek treble damages for Defendant's violations of § 2 under § 4 of the Clayton Act.

113.     Plaintiff and the Class also seek an injunction against Defendant, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT TWO
### Monopolization of the Scanner Market (15 U.S.C. §2)

114.     Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

115.     The relevant product market is the Scanner market, and the relevant geographic market is the United States.

116.      As a result of the scheme alleged herein, Defendant possesses monopoly power in the Scanner market, with a market share over 80%.

117.     Defendant leveraged its monopoly power in the Aligner market to further maintain and enhance its monopoly power in the Scanner market by, *inter alia*, terminating its Interoperability Agreement with 3Shape when 3Shape refused to cause Trios to work effectively with Defendant's Aligners exclusively, its refusal to accept scans from other comparable Scanners to order Invisalign, its refusal to accept STL files to order Invisalign, and its imposing burdensome and inefficient terms on dental professionals who want to order Invisalign without using the iTero, and its using its dominant position in the Aligner market to exclude competition in the Scanner market.

27

118.    Defendant's actions were carried out willfully and with the specific intent to maintain its monopoly power in the Scanner market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

119.    The direct, foreseeable, and proximate result of Defendant's anticompetitive conduct was to increase prices and harm competition in the Scanner market.

120.    There is no legitimate pro-competitive justification for Defendant's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

121.    As a direct, material, and proximate result of Defendant's violation of § 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

122.    Plaintiff and the Class seek treble damages for Defendant's violations of § 2 under § 4 of the Clayton Act.

123.    Plaintiff and the Class also seek an injunction against Defendant, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests:**

(a)     That the Court determine that Plaintiff's claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)     That the Court appoint Plaintiff as the representative of the Class;

(c)     That Plaintiff's counsel be appointed as counsel for the Class;

(d)     That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendant's violations of the Sherman Act;

(e)     That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendant from continuing its unlawful acts in violation of the Sherman Act;

(f)      That Plaintiff and the Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this action;

(g)      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

(h)      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

Dated:  March 14, 2019

Respectfully submitted,

Jeffrey S. Goddess (No. 630)
Jessica Zeldin (No. 3558)
P. Bradford Deleeuw (No. 3569)
**ROSENTHAL, MONHAIT & GODDESS, P.A.**
919 N. Market Street
Suite 1401
P.O. Box 1070
Wilmington, DE 19899
Phone: (302) 656-4433
Fax: (302) 658-7567
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com
bdeleeuw@rmgglaw.com

John Radice
Daniel Rubenstein
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Phone: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
drubenstein@radicelawfirm.com

Eric Cramer
**BERGER MONTAGUE, PC**
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-4604
Fax: (215) 875-5707
ecramer@bm.net

Daniel J. Walker
**BERGER MONTAGUE, PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
Fax: (215) 875-5707
dwalker@bm.net

*Counsel for Plaintiff and*
*the Proposed Class*