# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SIMON AND SIMON, PC d/b/a CITY SMILES, | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 19-506 (LPS) |
| ALIGN TECHNOLOGY, INC., | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This is an antitrust case. Plaintiff Simon and Simon, PC d/b/a City Smiles ("City Smiles" or "Plaintiff") filed this class action suit against Defendant Align Technology, Inc. ("Align" or "Defendant") on March 14, 2019, alleging violations of Section 2 of the Sherman Act, 15 U.S.C. § 2. (D.I. 1.) Align sells the Invisalign system, an orthodontic treatment for straightening teeth without metal braces. It involves the use of custom-made, plastic dental aligners. To make the aligners, Align requires a dental professional to obtain an impression of the patient's teeth and transmit that impression to Align. One way to take an impression is with a digital intraoral scanner. In September 2015, Align introduced a scanner called the iTero Element, which can be used to order Invisalign from Align. City Smiles purchased Align's iTero Element scanner in December 2016 and has prescribed Invisalign to its patients.

A previous antitrust lawsuit against Align was also before this Court, *3Shape Trios A/S v. Align Technology, Inc.*, C.A. No. 18-1332-LPS (D. Del.). On August 15, 2019, I recommended that the other case be dismissed without prejudice, and, on September 26, 2019, the Court adopted my Report and Recommendation. *3Shape Trios A/S v. Align Technology, Inc.*, C.A. No. 18-1332-

LPS, 2019 WL 3824209, at *10-12 (D. Del. Aug. 15, 2019), *adopted by* 2019 WL 4686614 (D. Del. Sept. 26, 2019). Similar facts and legal theories are at issue in this case.

Pending before the Court is Align's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, to transfer the case to the Northern District of California. Because City Smiles has failed to allege acts that—taken individually or together—constitute anticompetitive conduct, I recommend that Align's motion to dismiss be GRANTED.

## I. BACKGROUND[1]

Defendant Align is a Delaware corporation that sells Invisalign, a system of clear plastic aligners for straightening teeth. (D.I. 1 ¶¶ 31, 40.) As of September 2018, Invisalign's share of the United States aligner market was over 80%. (*Id.* ¶ 41.)

Invisalign aligners are custom made and must be obtained from dental professionals, who order them from Align. (*Id.* ¶¶ 43-45.) To order Invisalign, a dental professional must send an impression of a patient's teeth to Align. (*Id.* ¶¶ 50-51.) In 2015, Align introduced the iTero Element digital intraoral scanner, which can be used to obtain a digital impression for ordering aligners. (*Id.* ¶¶ 49-50.) The iTero Element scanner is another market leader, accounting for over 80% of the scanner market in the United States in 2017. (*Id.* ¶ 71.) Non-party 3Shape Trios A/S is a Danish corporation that produces the Trios, another digital intraoral scanner that can be used to order aligners. (*Id.* ¶¶ 32, 53.) 3Shape started selling the Trios in the United States in 2012. (*Id.* ¶ 48.)

---

[1] I assume the facts alleged in the Complaint to be true for purposes of resolving this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff City Smiles is a dental practice in Chicago, Illinois that prescribes aligners to its patients. (*Id.* ¶ 30.) City Smiles purchased an iTero Element scanner from Align in 2016 and purchased Invisalign for multiple patients between 2015 and 2018. (*Id.*)

The Complaint takes issue with two categories of conduct by Align that, Plaintiff contends, amount to an anticompetitive scheme to monopolize both the scanner and the aligner markets. The first relates to the criteria under which Align accepts orders for Invisalign. (*Id.* ¶ 80.) A dental professional can order Invisalign by sending Align a physical impression of a patient's teeth, for example, by creating a silicone mold. The Complaint alleges that silicone molds "are burdensome and inefficient and not an acceptable substitute for a proper Scanner." (*Id.* ¶ 68.)

Alternatively, a dental professional can order Invisalign by using the iTero Element scanner and sending Align a digital impression. (*Id.* ¶ 52.) For a fifteen-month period in 2016 to 2018, Align also accepted digital scans sent directly from 3Shape's Trios scanners, pursuant to an agreement between Align and 3Shape (the "Interoperability Agreement").[2] (*Id.* ¶¶ 55-56, 58, 64-65.) Pursuant to the Interoperability Agreement, Trios scanners were used to place over 40,000 Invisalign orders. (*Id.* ¶ 56.) In January 2018, shortly after Align filed four patent infringement lawsuits against 3Shape relating to the Trios scanner, Align terminated the Interoperability Agreement and stopped accepting scans sent directly from Trios scanners. (*Id.* ¶ 16; *see* Nos. 17-1646, -1647, -1648, -1649 (D. Del.).)

Align also accepts digital scans from scanners made by two other manufacturers: 3M's True Definition and Dentsply Sirona's CEREC Omnicam. (D.I. 1 ¶¶ 50, 57, 94-95.) According to the Complaint, however, those scanners are designed to scan individual teeth and are unsuitable

---

[2] 3Shape sold the Trios scanner in the United States for approximately four years without an Interoperability Agreement with Align. (*See* D.I. 1 ¶¶ 48, 55.)

for making aligners. (*Id.*) Thus, according to the Complaint, a scanner is the only "acceptable" way to order aligners, and Align's iTero Element and 3Shape's Trios are the only "suitable" scanners. (*Id.* ¶ 68.) Since Align no longer accepts Invisalign orders from Trios scanners, the only "viable" way to order Invisalign-brand aligners is to use Align's iTero Element. (*Id.*)

The second category of challenged conduct relates to the design of the iTero Element. (*Id.* ¶ 81.) Align designed the iTero Element with the capability to send digital scans directly to Align for orders of Invisalign. (*Id.* ¶ 52.) The iTero Element cannot send scans directly to Align's competitors in the aligner market. If a dental professional wants to send a scan taken by the iTero Element to another aligner manufacturer, the dental professional must pay a fee to Align to convert the scan into another format. (*Id.*) The Complaint does not provide any further information about the fees.

According to City Smiles, those two categories of conduct by Align—(1) Align's refusal to accept scans from the Trios scanner for Invisalign orders and (2) the design of Align's scanner—operate as "a de facto bundle by making it impracticable for Dental Practices to sell Invisalign without an iTero Scanner, or for Dental Practices with an iTero Scanner to sell other Aligners." (*Id*. ¶¶ 103, 107, 117.) City Smiles alleges that Align's actions have harmed competition in the scanner and aligner markets, "resulting in higher prices, reduced competition, and reduced product choice." (*Id.* ¶¶ 82-83.) According to City Smiles, it was injured as a direct result of its purchase of an iTero Element scanner in 2016 and the numerous Invisalign orders it made between 2015 and 2018, all at "artificially inflated" prices. (*Id.* ¶¶ 10, 30.)

City Smiles' Complaint sets forth the following claims: monopolization of the clear aligner market under Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count 1); and monopolization of the market for scanners for orthodontic treatment under Section 2 of the Sherman Act (Count 2). (*Id.*

4

¶¶ 104-123.)  City Smiles seeks treble damages and injunctive relief under Sections 4 and 16 of the Clayton Act, respectively.  (*Id.*)

Align filed the pending motion to dismiss on April 5, 2019 (D.I. 6), and the parties completed the briefing on May 10, 2019.  (D.I. 7, 12, 13.)  Align requested oral argument (D.I. 14), and I heard oral argument on August 1, 2019.  ("Tr. __".)

## II.  LEGAL STANDARDS

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A possibility of relief is not enough.  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  In determining the sufficiency of the complaint under the plausibility standard, all "well-pleaded facts" are assumed to be true, but legal conclusions are not.  *Id.* at 679.

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Twombly*, 550 U.S. at 558 (internal marks omitted).  "Antitrust claims in particular must be reviewed carefully at the pleading stage because false condemnation of competitive conduct threatens to 'chill the very conduct the antitrust laws are designed to protect.'"  *In re Keurig Green Mt. Single-serve Coffee Antitrust Litig.*, 383 F. Supp.

5

3d 187, 218 (S.D.N.Y. 2019) (quoting *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004)). However, the same *Twombly* plausibility standard applies. *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) ("[I]t is inappropriate to apply Twombly's plausibility standard with extra bite in antitrust and other complex cases.").

## III. DISCUSSION

Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it unlawful to "monopolize" or "attempt to monopolize."[3] It does not prohibit monopolies. Indeed, the possession of monopoly power is not only legal, "it is an important element of the free-market system." *Trinko*, 540 U.S. at 407 ("The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth.").

A Section 2 plaintiff must therefore do more than just prove a monopoly. To succeed on a monopolization claim, the plaintiff must demonstrate both (1) the defendant's possession of monopoly power in a relevant market and (2) anticompetitive conduct. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). A private plaintiff (as opposed to a government plaintiff) must also demonstrate that it suffered injuries caused by the defendant's anticompetitive conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012).

Align argues that the Complaint fails to plausibly allege anticompetitive conduct. I agree.

---

[3] "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

6

Anticompetitive conduct is "generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Broadcom*, 501 F.3d at 308. On the other hand, "[c]onduct that merely harms competitors, . . . while not harming the competitive process itself, is not anticompetitive." *Id.*; *W. Penn*, 627 F.3d at 108 ("The line between anticompetitive conduct and vigorous competition is sometimes blurry, but distinguishing between the two is critical, because the Sherman Act 'directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.'" (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)).

"'Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.'" *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). Examples of agreements that may constitute anticompetitive conduct under Section 2 include conspiracies to exclude a rival, *W. Penn*, 627 F.3d at 109, exclusive dealing arrangements, *United States v. Dentsply*, 399 F.3d 181, 187 (3d Cir. 2005), and tying agreements, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992).

As a general rule, however, "purely unilateral conduct does not run afoul of section 2 – 'businesses are free to choose' whether or not to do business with others and free to assign what prices they hope to secure for their own products." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (citing *Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 448 (2009)); *see also Trinko,* 540 U.S. at 408 ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" (quoting *United*

*States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *Broadcom*, 501 F.3d at 316 ("A firm is generally under no obligation to cooperate with its rivals.").

But general rules generally have exceptions, and the rule protecting unilateral conduct does too. One exception is predatory pricing. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-23 (1993). A more controversial exception (albeit one recognized in the Third Circuit) is bundled discounts. *LePage's*, 324 F.3d at 154-58. Another is antitrust duty to deal. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600-01 (1985). Courts also recognize that deceptive or bad faith conduct can be anticompetitive. *See Broadcom*, 501 F.3d at 314 (patentee's deception of a standards setting organization can be anticompetitive); *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*") (sham litigation can be anticompetitive). There are legal rules that govern the application of each of these exceptions.

As explained above, the Complaint in this case sets forth two categories of conduct that, City Smiles alleges, are anticompetitive: (1) Align's refusal to accept Invisalign aligner orders sent from 3Shape's Trios scanner and (2) Align's design of its iTero scanner (to make it easier and cheaper to order Invisalign aligners than aligners made by its competitors). For the reasons set forth below, I agree with Align that those actions do not constitute actionable anticompetitive conduct, viewed either alone or together.

**A. Refusal to Accept Scans from 3Shape's Trios**

As explained above, a firm generally has no duty to cooperate with its rivals. Firms can usually choose to do business with their rivals or they can choose not to, and they can change their minds. *See linkLine*, 555 U.S. at 448 ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Christy*

8

*Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1198 (10th Cir. 2009) ("The antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path."); *Olympia Equipment Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) ("If a monopolist does extend a helping hand, though not required to do so, and later withdraws it as happened in this case, does he incur antitrust liability? We think not."). Thus, the mere termination of a contract with a rival does not constitute anticompetitive conduct. *See, e.g., In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) ("The mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'"); *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, No. 10-635, 2016 WL 3610155, at *13 (D. Del. July 1, 2016).

Here, Plaintiff challenges Align's termination of the Interoperability Agreement with 3Shape. If there is any requirement that Align cooperate with 3Shape, it must fall under the narrow refusal to deal doctrine created by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In that case, the plaintiff and defendant ski operators had previously cooperated to offer joint passes to both companies' mountains, until the defendant terminated the arrangement. *Id.* at 587–95. When the plaintiff tried to recreate the multi-mountain pass by offering to pay the defendant market price for its tickets, the defendant refused. *Id.* at 593–94.

The Supreme Court affirmed a jury verdict finding that the defendant's termination of the arrangement was anticompetitive and violated Section 2. While *Aspen* could be interpreted to require a competitor to continue to engage in a pre-existing course of dealing once it starts, the Supreme Court has since held that *Aspen* "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. To proceed under the limited duty to deal exception created by *Aspen*, not only

9

must the plaintiff show a pre-existing business relationship with the defendant, the circumstances surrounding the termination of that relationship must "suggest[] a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409.

In *Aspen*, the circumstances suggested that the preexisting joint ticket arrangement was profitable for the defendant, and the defendant was unwilling to renew the ticket even if compensated at its own retail price. 472 U.S. at 589-94; *Trinko*, 540 U.S. at 409. Those facts permitted an inference that the defendant acted solely to reduce the value of the plaintiff's ski mountain and force it to sell. *Trinko*, 540 U.S. at 409. In other words, the defendant's conduct was "irrational but for its anticompetitive effect." *Novell,* 731 F.3d at 1075; *see also* Areeda & Hovencamp, *Antitrust Law* ¶ 772d3 (Supp. 2019) ("[B]efore a unilateral refusal to deal is unlawful under § 2, the refusal must be 'irrational' in the sense that the defendant sacrificed an opportunity to make a profitable sale only because of the adverse impact the refusal would have on a rival.").

Limiting antitrust scrutiny of refusals to deal to circumstances where the defendant's conduct is economically irrational is potentially underinclusive, *i.e.*, it may allow some refusals to deal to evade antitrust scrutiny even when they actually have anticompetitive effects. *See Novell*, 731 F.3d at 1073, 1076. But the Supreme Court has concluded that the benefits of expanding the refusal to deal doctrine do not outweigh the costs, including (1) the risk of false positives, which may harm innovation, (2) the risk of collusion between companies forced to deal, (3) the inability of courts to supervise the terms and conditions of forced dealing, and (4) the absence of fair notice to business people. *linkLine*, 555 U.S. at 452-453; *Trinko*, 540 U.S. at 408, 414; *see also Novell*, 731 F.3d at 1076 ("If the [refusal to deal] doctrine fails to capture every nuance, if it must err still to some slight degree, perhaps it is better that it should err on the side of firm independence—

10

given its demonstrated value to the competitive process and consumer welfare—than on the other side where we face the risk of inducing collusion and inviting judicial central planning.").

Because companies are generally free to choose with whom they deal, the only path forward for Plaintiff's allegations about Align's termination of the Interoperability Agreement is under the refusal to deal doctrine. But Plaintiff's allegations lack the essential feature of an anticompetitive refusal to deal. Assuming the Interoperability Agreement was profitable for Align (as alleged in the Complaint), that does not by itself lead to a plausible inference that Align's termination of the agreement was economically irrational, as required by *Aspen*. Rather, Align's conduct, as alleged, is also consistent with an inference that Align wanted to increase sales of its own scanner. *See Novell,* 731 F.3d at 1075 (explaining that a firm may choose to withdraw from a profitable course of dealing for procompetitive reasons, such as when a firm desires "to pursue an innovative replacement product of its own," and that courts should look at profits across business lines to determine if conduct is economically irrational).

To plead an antitrust refusal to deal, the Complaint must contain facts plausibly suggesting that the defendant's conduct made no economic sense but for its anticompetitive purpose. *Viamedia, Inc. v. Comcast Corp.*, No. 16-5486, 2017 WL 698681, *5-6 (N.D. Ill. Feb. 22, 2017) (dismissing refusal to deal claim when complaint failed to plead facts plausibly suggesting that the defendants' conduct was economically irrational); *VBR Tours, LLC v. Yankee Leisure Grp., Inc.*, No. 14-00804, 2015 WL 5693735, *8-9 (N.D. Ill. Sept. 28, 2015) (same). Here, the Complaint itself reveals an alternative, procompetitive explanation for Align's refusal to deal with 3Shape, and there is no allegation (plausible or otherwise) that Align's conduct made no economic sense

11

across the aligner and scanner markets.[4] *See Novell,* 731 F.3d at 1075; *see also VBR Tours*, 2015 WL 5693735, *9 (plaintiff "plead[ed] himself out of court" when complaint suggested potential valid business reasons for defendant's refusal to deal, and "then fail[ed] to address, let alone plausibly rebut, those reasons").

Because the Complaint does not plausibly allege circumstances invoking the refusal to deal doctrine, Align's termination of the agreement with 3Shape by itself is not anticompetitive.

**B. Design of the iTero Element scanner**

The second category of conduct alleged to be anticompetitive relates to Align's introduction of its iTero Element scanner in 2015. Plaintiff takes issue with the design of Align's iTero Element scanner, which is capable of sending scans directly to Align. If a dental professional desires to send a scan taken by the iTero Element to one of Align's competitors, the dental professional must take additional steps and pay a fee to Align. In essence, Plaintiff contends that Align should have designed its scanner to make it easier and cheaper for dental professionals to order scans from Align's competitors.

That is just another refusal to deal claim. Plaintiff is asking Align to deal with its rivals in the aligner market by designing its iTero Element scanner to send them business on favorable terms, namely, (1) directly from the scanner and (2) without charge to the user. However, as

---

[4] Perhaps recognizing the difficulty in proceeding under the refusal to deal doctrine, City Smiles tries to recast Align's termination of the Interoperability Agreement as a design change to Align's manufacturing process. (D.I. 12 at 15.) That does not change the analysis. Whatever you want to call it, the result was that Align quit accepting orders for Invisalign from 3Shape's Trios scanner. That makes this a refusal to deal case, and City Smiles cannot evade refusal to deal doctrine simply by calling the conduct another name. *See Novell*, 731 F.3d at 1079 ("Whether one chooses to call a monopolist's refusal to deal with a rival an act or omission, interference or withdrawal of assistance, the substance is the same and it must be analyzed under the traditional [refusal to deal] test . . . .").

12

already explained, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448.

Once again, the only path forward for 3Shape is under the refusal to deal doctrine set forth in *Aspen Skiing*. But the Complaint here fails to plausibly allege the first requirement of *Aspen*: "a preexisting voluntary and presumably profitable course of dealing between the monopolist and the rival." *Novell*, 731 F.3d at 1074. Align never had a deal with its rivals in the aligner market governing the terms and conditions under which the iTero Element could be used to send them business.[5]

Absent a duty to deal, antitrust law does not require a firm to lend its competitors a helping hand. *See Novell*, 731 F.3d at 1072. Align's design of its iTero Element scanner by itself does not constitute anticompetitive conduct.

### C. Scheme of Anticompetitive Conduct

Plaintiff next contends that, even though Align's acts viewed individually may not be anticompetitive, as a whole they amount to a scheme of anticompetitive conduct cognizable under Section 2. (D.I. 1 ¶¶ 8, 11, 13; D.I. 13 at n.20; Tr. 17-29.) I disagree.

Plaintiff cites no case for the novel proposition that a defendant may incur antitrust liability for unilaterally refusing to deal in two markets under circumstances where it has no antitrust duty to deal in either market. And I am unaware of any. Rather, as I explained in my Report and

---

[5] The Complaint does not allege that the design of Align's iTero Element scanner has ever changed. The Court is therefore not confronted with an allegation of anticompetitive product redesign.

Nor does this case concern the interoperability or integration of complementary products in two markets, as was at issue in *United States v. Microsoft*. 253 F.3d 34, 64-67 (D.C. Cir. 2001) (assessing antitrust consequences relating to the interoperability of browser and operating system under circumstances where the defendant's products were distributed together and could not be disaggregated). Unlike the product markets at issue in *Microsoft*, intraoral scanners and aligners are sold independently, can be used independently, and don't interact with each other in operation.

Recommendation in *3Shape Trios A/S v. Align Technology, Inc.*, plaintiffs proceeding under an anticompetitive scheme theory must plead at least one instance of conduct that is not protected from antitrust scrutiny. 2019 WL 3824209, at *10-12 (D. Del. Aug. 15, 2019), *adopted by* 2019 WL 4686614 (D. Del. Sept. 26, 2019); *see also Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 Fed. App'x 186, 191 (2d Cir. 2012) (affirming dismissal of an antitrust claim; "[b]ecause these alleged instances of misconduct are not independently anti-competitive, we conclude that they are not cumulatively anti-competitive either"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 5458570, at *12 (D. Mass. Sept. 16, 2015) (concluding that a complaint failed to state a Section 2 claim under an "overarching scheme" theory when none of the alleged conduct was independently anticompetitive); *In re Lipitor Antitrust Litig.*, No. 13-2389, 2013 WL 4780496, *23 (D.N.J. Sept. 5, 2013) ("Having already determined that all of the specific allegations of conduct in violation of Section 2 . . . are meritless and insufficient to state a claim for relief, the Court finds that a claim based on the purported 'combined' impact of Plaintiffs' claims is also without merit.").

Plaintiff's two wrong refusal to deal claims do not make a right. Plaintiff's characterization of Align's otherwise non-actionable refusals to deal as a "scheme" do not save its claims.

**D. "Bundling"**

Plaintiff nevertheless alleges that Align's conduct, viewed together, amounts to anticompetitive "bundling." (*See* D.I. 1 ¶¶ 77, 99-103.) I disagree.

The Third Circuit (but not the Supreme Court) has recognized a bundled discount exception to the general rule protecting above-cost (*i.e.*, non-predatory) price discounts from antitrust scrutiny. A bundled discount is when a firm sells a bundle of goods for a lower price than the seller charges for the goods purchased individually. *LePage's*, 324 F.3d at 154-157; *Eisai, Inc. v.*

14

*Sanofi Aventis U.S., LLC*, 821 F.3d 394, 405 (3d Cir. 2016) ("[A] bundling arrangement generally involves discounted rebates or prices for the purchase of multiple products."). In *LePage's*, the Third Circuit held that bundled discounts can constitute anticompetitive conduct when the effect of the discounts is to "foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." *Id.* at 155. The *LePage's* standard for bundled discounts has not been adopted by any other Circuit, and it has not been expanded in the Third Circuit. *See Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 894-903, 908-09 (9th Cir. 2008) (discussing the controversy over *LePage's*). The Third Circuit has instructed courts to interpret *LePage's* narrowly in light of more recent Supreme Court precedent. *ZF Meritor*, 696 F.3d at 274 n.11; *see also Eisai*, 821 F.3d at 405-406 (rejecting novel bundling theory based on a bundle of different types of demand as opposed to a bundled discount for multiple products).

The Complaint in this case does not allege that Align offered bundled discounts, *i.e.*, that it offered discounts to customers who purchased both scanners and aligners. The Complaint alleges that Align charged "inflated" prices on both aligners and scanners. (D.I. 1 ¶¶ 2, 18, 103.) *LePage's* is thus inapposite.

Plaintiff acknowledges that *LePage's* is distinguishable because it involves price discounts, but it argues (in a footnote) that the conduct here "is even more plainly harmful because the customer gets no discount with the bundle and, instead, faces a penalty for breaking the bundle." (D.I. 12 at 17 n.27.) I disagree on the facts and the law. As for the facts, the Complaint does not allege that iTero Element owners paid a penalty for ordering aligners from other manufacturers. The Complaint alleges that Align only charged a fee if a dental professional wanted Align to convert a scan made by the iTero Element. Dental professionals who owned iTero Element

15

scanners could order other manufacturers' aligners without paying a fee by using another scanner or by using silicone molds. Conversely, dental professionals without an iTero Element scanner could order Invisalign by using silicone molds or by purchasing one of the other scanners able to order Invisalign.

As for the law, even if I were to analyze Align's conduct under the standard set forth in *LePage's*, the facts alleged do not plausibly suggest that Align's charging of file conversion fees operated to foreclose other aligner manufacturers from the market. For example, there is no suggestion in the Complaint that the fee was so high that a rival aligner manufacturer couldn't offset it with a price discount. In other words, the facts do not plausibly suggest that rival aligner manufacturers could not make a "comparable offer." *LePage's*, 324 F.3d at 155.

The Third Circuit has instructed lower courts not to extend *LePage's*, and I see no basis to do so on the allegations here. Plaintiff's characterization of Align's conduct as "bundling" does not save its claims.

### E. Monopoly Leveraging

Plaintiff also attempts to proceed on a monopoly leveraging theory. A monopoly leveraging claim is a Section 2 monopolization claim or attempted monopolization claim involving conduct in more than one market. To succeed, a plaintiff must demonstrate "that a party has a monopoly in one area, uses unlawful acts to leverage that monopoly into another area, and achieves or is likely to achieve that second monopoly." *IQVIA Inc. v. Veeva Systems, Inc.*, No. 17-cv-177, 2018 WL 4815547, at *4 (D.N.J. Oct. 3, 2018).

Monopoly leveraging, however, is not a standalone theory of liability under Section 2. *See Trinko,* 540 U.S. 398 at 415 n.4 (rejecting standalone monopoly leveraging claim); *Daisy Mountain Fire Dist. v. Microsoft Corp.*, 547 F. Supp. 2d 475, 487 (D. Md. 2008) ("The Supreme

Court has held that monopoly leveraging does not provide a basis for recovery distinct from a monopolization claim."). Nor does pleading monopoly leveraging relieve a party's obligation to allege anticompetitive conduct. *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1222 (10th Cir. 2009) ("*Trinko* further emphasized that, '[i]n any event, leveraging [like, we might add, any other Section 2 claim'] presupposes anticompetitive conduct,' rather than providing an excuse for establishing such conduct." (quoting *Trinko*, 540 U.S. at 415 n.4)); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1035 (D. Ore. 2015) ("The Supreme Court has established that a claim for monopoly leveraging 'presupposes anticompetitive conduct.' That is, there must be some other conduct that is actionable for Plaintiff's claim to be cognizable." (internal citation omitted)).

The cases relied on by Plaintiff are distinguishable because they involved independent allegations of anticompetitive conduct (in addition to leveraging). *IQVIA Inc.*, No. 17-cv-177, 2018 WL 4815547, at *1-2 (refusal to deal); *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997) (exclusive dealing); *Hewlett-Packard Co. v. Arch Assocs. Corp.*, 908 F. Supp. 265 (E. D. Pa. 1995) (refusal to deal). As explained above, the Complaint here does not allege any anticompetitive conduct. Plaintiff's monopoly leveraging claim must therefore fail. *See, e.g., Vesta Corp.*, 129 F. Supp. 3d at 1035 (concluding that the "monopoly leveraging claim fails for the same reasons as Plaintiff's other antitrust claims fail—Plaintiff fails to allege anticompetitive conduct").

As 3Shape's failure to plead anticompetitive conduct fully supports granting Align's motion to dismiss,[6] the Court need not decide whether the other grounds raised by Align (lack of standing[7] and failure to allege relevant product markets) would also support dismissal.[8]

## IV. CONCLUSION

For the reasons set forth above, City Smiles' Complaint fails to plausibly allege anticompetitive conduct, a required element of monopolization under Section 2 of the Sherman Act. I recommend that Align's motion be GRANTED, that the Complaint be DISMISSED without prejudice, and that City Smiles be granted leave to amend the Complaint within 21 days.[9]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages.

---

[6] In the alternative, Align sought transfer of the case to the Northern District of California. (D.I. 7.) Because I recommend that the case be dismissed, I do not address Align's transfer arguments. *See* Tr. 15 (Align's agreement that dismissal in lieu of transfer is appropriate).

[7] Antitrust standing is a prudential limitation. As it does not affect subject matter jurisdiction, there is no requirement that the Court consider it at this time. *See Shionogi Pharma, Inc. v. Mylan, Inc.*, No. 10-1077, 2011 WL 2174499, *3 (D. Del. May 26, 2011) (dismissing Section 2 claim for failure to state a claim without addressing the parties' dispute over antitrust standing).

[8] Plaintiff's Complaint also alleged a class. The Court need not address class certification before dismissing the case. *See, e.g., Donnenfeld v. Petro Home Servs.*, No. 16-882, 2017 WL 1250992, at *6 (D.N.J. Mar. 24, 2017) ("[B]ecause the Court is dismissing the Complaint, the Court will not consider Defendants' arguments regarding class certification at this time").

[9] Align requests that the Complaint be dismissed without leave to amend because any amendment would be futile. However, it is not clear on this limited record that amendment would necessarily be futile. *See Alston v. Parker*, 363 F.3d 229, 235-36 (3d Cir. 2004) (holding that leave to amend should be granted "unless a curative amendment would be inequitable, futile, or untimely").

The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.

Dated: October 15, 2019

                                             Honorable Jennifer L. Hall
                                             United States Magistrate Judge